DENNIS J. SALLAZ, ISB No. 1053
G. SCOTT GATEWOOD, ISB No. 5982
SALLAZ & GATEWOOD, CHTD.
Lauren E. McConnell, ISB No. 9083
Attorneys at Law
P.O. Box 8956
Boise, Idaho 83707
Telephone (208) 336-1145
Facsimile: (208) 336-1263

Attorneys for the Plaintiff
Rowe Burningham

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| ROWE BURNINGHAM, | Case No. |
| Plaintiff, | |
| vs. | |
| CORRECTIONS CORPORATION OF AMERICA, BRENT REINKE, SERGEANT GREEN, SERGEANT MARTINEZ, OFFICER J. HUDON, COUNSELOR SARAH FINK, WARDEN TIMOTHY WENGLER, DAVID ALGER, BRYCE AITKENS, AND OTHER INDIVIDUALS WHOSE IDENTITIES ARE AT THE PRESENT TIME UNKNOWN, all in their individual capacities, | **PLAINTIFF'S COMPLAINT FOR** **DAMAGES AND DECLARATORY** **AND INJUNCTIVE RELIEF** |
| Defendants. | |

## INTRODUCTION

1.      This is an action arising out of personal injuries inflicted upon the person of the

Plaintiff, Rowe Burningham, in violation of his rights as guaranteed in the Eighth and Fourteenth

Amendments to the Constitution of the United States. and by federal law, particularly 42 U.S.C. §

*COMPLAINT – PAGE 1*

1983, while under the custody and control of the named Defendants, for which the Plaintiff Burningham is entitled to damages for the deprivation of his civil rights under 42 U.S.C. § 1983, and also for the purposes of obtaining the costs of suit, including reasonable attorney fees, and for the recovery of all damages suffered by plaintiff as caused by defendants.

2.     ICC is an exceptionally violent prison. Called "Gladiator School," more violence occurs at ICC that at Idaho's eight other prisons combined. ICC is entrenched in a culture where ICC staff uses prisoner violence as a management tool.

3.     Violence is rampant at ICC for a host of reasons, including the fact that the Defendants turn a blind eye to it, fail to adequately investigate assaults and therefore are unable to fashion effective remedial measures to prevent assaults from recurring; they refuse to discipline the guards whose malfeasance precipitated prisoner violence; they frequently place vulnerable inmates with predators; they fail to protect inmates who request and need protection from assault; and ICC is understaffed, inadequately supervised, and guards are inadequately trained.

4.     ICC is owned by the State of Idaho. It was built with tax funds, and is located on public land. However, ICC is operated for profit by Corrections Corporation of America, Inc., pursuant to a contract with the Idaho Department of Corrections (IDOC). Accordingly, Corrections Corporation of America, Inc. (hereinafter "CCA") performs the public function of operating ICC.

5.     CCA is the nation's largest owner and operator of partnership correction and detention facilities and one of the largest prison operators in the United States, behind only the federal government and three states. CCA currently operates 67 facilities, 47 of which are company-owned facilities, with a total design capacity of approximately 92,000 beds in 20 states and the District of Columbia.

*COMPLAINT – PAGE 2*

6.     The Eighth Amendment to the Constitution prohibits the imposition of "cruel and unusual punishments." Included in this prohibition is violence at the hands of other prisoners. The Supreme Court has recognized that prison officials have a duty "to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 833 (1994). In other words, people are sent to prison as punishment, not for punishment. "Being violently assaulted in prison is not part of the penalty that criminal offenders pay for their offense against society." *Farmer*, 511 U.S. at 834 (internal citation omitted). Government officials "are not free to let the state of nature take its course" in America's prisons. *Farmer*, at 833. The administrators of ICC are ignoring this constitutional and contractual duty, resulting in fear, intimidation, and violence within the inmate population.

7.     CCA habitually ignores this duty to protect prisoners from other prisoners at the facility it operates in Kuna, Idaho, known as ICC. Indeed, CCA has an easily proven persistent pattern of misconduct at ICC amounting to a policy which allows, encourages, and profits from prisoner violence. Part of this policy includes failing to adequately protect sex offenders from prison gangs, known by CCA as "Security Threat Groups." In violation of the settlement agreement negotiated in the District of Idaho in September of 2011 (*see Kelly et al., v. Wengler et al.,* Case No. 1:11-CV-185-EJL), CCA continued to fail to provide adequate protections for inmates known to be vulnerable to prison gang violence. As a direct result, Plaintiff suffered severe and permanent physical and mental injury.

8.   CCA has sufficient wealth and income to provide for security and safety of the inmates entrusted to their care, but has repeatedly put profits ahead of inmate safety. CCA reported a Net Income of $156,761,000 and a total revenue of $1,759,885,000 for the year of 2012. As of October 10, 2013, CCA's market capitalization was approximately $4.3 billion. In 2011, CCA's six most

*COMPLAINT – PAGE 3*

highly compensated executives made more than $12MM:

| | |
|---|---|
| Damon T. Hininger/President and Chief Executive Officer | $3,696,798 |
| Richard P. Seiter/Special Assistant to the CEO | $1,845,566 |
| John D. Ferguson/Chairman of the Board and Fmr CEO | $1,734,893 |
| Todd J. Mullenger/Ececutive Vice President and CFO | $1,835,048 |
| Anthony L. Grande/EVP and Chief Development Officer | $1,735,039 |
| Brian D. Collins/EVP and Chief Human Resources Officer | $1,505,146 |

9.      Despite agreeing to address these (and other) concerns in their 2011 settlement agreement, CCA not only failed to adequately staff ICC, but lied about it and was held in contempt September 16, 2013. (see *Kelly et al., v. Wengler et al.*, Case No. 1:11-CV-185-S-EJL). CCA will go to extraordinary lengths to protect its enormous profits. CCA is aware and courts have recognized that for-profit prisons inherently risk violation of constitutional rights if such violations would be profitable. "Especially when a private corporation is hired to operate a prison, there is an obvious temptation to skimp on civil rights whenever it would help to maximize shareholders' profits . . . In such circumstances, the threat of incurring money damages might provide the *only* incentive for a private corporation and emploees to respect the Constitution." *Manis v. Corrections Corp. of Am.*, 859 F. Supp. 302, 305-306, (M.D. Tenn. 1994).

10.     Plaintiff has suffered serious and substantial injuries as a direct result of CCA's policy to ignore repeated requests to protect vulnerable inmates from prison-gang violence in its pursuit of enormous profits. Plaintiff hopes resolution of this case will ensure his safety for the remainder of his sentence, and will prevent similar incidents from occurring. As the court recognized in *Manis*, an award of punitive damages sufficient to punish and DETER these harmful policies is necessary. As CCA has demonstrated that previous penalties were not sufficient to deter its behavior or coerce it to correct its policies, the best and only way to have a deterrent effect is for the jury to make a punitive award that is large enough to impact what might

COMPLAINT – PAGE 4

be distributed to shareholders and employees in future years. In this way, and only in this way, will shareholders be encouraged to take action to demand the board of directors replace management whose policies caused a reduction in corporate dividends.

11.     While the Plaintiffs do not specify any particular amount of punitive damages that would be sufficient to have the deterrent purpose envisioned by Congress and the courts in fashioning this remedy, based on the information presently available, the number must be substantially more than the compensation paid to the executives named in this complaint, as the cumulative effect of previous penalties has not yet had the necessary deterrent effect.

## JURISDICTION AND VENUE

12.     This action arises under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §1983. Jurisdiction is proper pursuant to 28 U.S.C. §§1331 and 1343(a)(3) and (4). Venue is properly found in this District pursuant to 28 U.S.C. §1391(b), as Plaintiff resides and Plaintiff's claims arose within the District.

## PLAINTIFF

13.     Plaintiff Rowe Burningham is an adult citizen of the United States and is a prisoner incarcerated under the jurisdiction of the Idaho Department of Corrections (hereinafter, "IDOC"). Plaintiff was incarcerated at the ICC in Kuna, Idaho, on October 11, 2011 and is presently in the custody of the Idaho Department of Corrections in the State of Idaho.

## DEFENDANTS

14.     Defendant Corrections Corporation of America (CCA) is a for-profit business

*COMPLAINT – PAGE 5*

incorporated under the laws of Maryland. As part of its enterprises, CCA operates the private prison, ICC.

15.     ICC was constructed on state-owned land in Kuna, Idaho, with public tax funds. ICC is operated under the jurisdiction of the IDOC. IDOC entered into a contract with CCA under which CCA is paid to manage and operate ICC on a day-to-day basis.

16.     At all times relevant hereto, the Defendant Brent Reinke, was the duly appointed, qualified Director of the Idaho Department of Corrections (IDOC), a political subdivision of the State of Idaho, and is and was at all times relevant herein was a resident of Ada County, state of Idaho. As such, he is the agency official ultimately responsible under state law for ensuring the health and safety of the IDOC prisoners assigned to ICC. Mr. Reinke is sued in his official capacity only, that is, damages are not being sought against him but rather declaratory and injunctive relief.

17.     At all times relevant hereto, the Defendant Sargent _____ Green, whose first name cannot be known until discovery is complete, was a duly appointed, qualified and acting officer under the authority of the of the Department of Corrections of the State of Idaho, and Corrections Corporation of America and is and was at all times relevant herein was a resident of Ada County, state of Idaho.

18.     At all times relevant hereto, the Defendant Sergeant _____ Martinez, whose first name cannot be known until discovery is complete, was a duly appointed, qualified and acting officer under the authority of the of the Department of Corrections of the State of Idaho, and Corrections Corporation of America and is and was at all times relevant herein was a resident of Ada County, state of Idaho.

19.     At all times relevant hereto, the Defendant Officer J. _____ Hudon, whose first name cannot be known until discovery is complete, was a duly appointed, qualified and
*COMPLAINT – PAGE 6*

acting officer under the authority of the of the Department of Corrections of the State of Idaho, and Corrections Corporation of America and is and was at all times relevant herein was a resident of Ada County, state of Idaho.

20.     At all times relevant hereto, the Defendant Counselor Sarah Fink, whose first name cannot be known until discovery is complete, was a duly appointed, qualified and acting officer under the authority of the of the Department of Corrections of the State of Idaho, and Corrections Corporation of America and is and was at all times relevant herein was a resident of Ada County, state of Idaho.

21.     At all times relevant hereto, the Defendant Warden Timothy Wengler, was a duly appointed, qualified and acting Officer under the authority of the of the Department of Corrections of the State of Idaho, and Corrections Corporation of America and is and was at all times relevant herein was a resident of Ada County, state of Idaho.

22.     At all times relevant hereto, the Defendants David Agler and Bryce Aitken were duly appointed, qualified and acting officers under the authority of the of the Department of Corrections of the State of Idaho, and Corrections Corporation of America and who are and were at all times relevant herein residents of Ada County, state of Idaho.

23.     In addition, JOHN & JANE DOE Defendants, whose identities are at the present time unknown, are named in this action, and who will be substituted in by their true names, when and if such additional party defendants are identified.

24.     The above-named defendants (hereinafter collectively referred to as, "prison staff," or "correctional officers," or "prison officials") are sued individually. Relief is sought against each and all defendants as well as their agents, assistants, successors, employees and persons acting in concert or cooperation with them or at their direction or under their supervision.

*COMPLAINT – PAGE 7*

25.     At all times relevant herein, the above-named defendants, and their agents, assistants, and employees acted pursuant to the policies, regulations or decisions adopted or promulgated by those in the Corrections Corporation of America and the Idaho Department of Corrections whose acts may fairly be said to represent official policy or were pursuant to governmental custom of the Idaho Department of Corrections.

26.     At all times relevant herein, defendants have acted under the color of authority of the law of the State of Idaho or in active concert with such defendants who are so acting.


### STATEMENT OF FACTS

27.     On or about October 11, 2011, at approximately 7:00 p.m., the Plaintiff Mr. Rowe Burningham was viciously attacked and injured by another inmate, Michael Shaw Balloue, while incarcerated at the Idaho Correctional Center, so that Mr. Ballou could earn his way into a prison gang. (*See* CR-FE-2011-0017168.)

28.     Mr. Burningham had previously been held in A-tier segregation, and was to return to A-tier, but there were no available beds on A-tier upon his release from segregation. On August 23, 2013, Mr. Burningham asked Sargent _____ Green if he could be placed on tier E-2 while awaiting an open bed on A-tier. Sargent _____ Green informed Mr. Burningham that would be placed in either tier D-2 or tier F-1. At that time, Mr. Burningham informed Sargent _____ Green that a review of his C-notes would show that housing in tiers D-2 or F-1 was inappropriate given Mr. Burningham's charges and the propensity of prison gang violence towards sex offenders on those tiers.

29.     Sargent _____ Green failed to review Mr. Burningham's C-notes, or if

*COMPLAINT – PAGE 8*

review was conducted, failed to appropriately address Mr. Burningham's housing assignment, and deliberately placed Mr. Burningham on tier D-2, ignoring Mr. Burningham's protest.

30.     Sargent _____ Martinez created the housing plan which placed Mr. Burningham on tier D-2. This plan was created without appropriate review of Mr. Burningham's C-notes which demonstrated that housing on tier D-2 was inappropriate given Mr. Burningham's charges and the propensity of gang violence towards sex offenders on that tier.

31.     Counselor Sarah Fink was responsible for the screening of Mr. Burningham's placement. Ms. Fink failed to adequately screen Mr. Burningham, as an adequate review of his C-notes would have demonstrated that as a sex offender, Mr. Burningham was particularly susceptible to attacks of prison gang violence on the tiers D-2 and F-1.

32.     On or about October 11th, Mr. Burningham was walking in a common area of his tier, D-2, when Michael Shaw Balloue punched Mr. Burningham repeatedly, causing Mr. Burningham to collapse to the floor, trying in vain to protect his face, while Mr. Balloue continued to beat him. The only prison staff present at that time was Officer J. _____ Hudon. Before Officer J. _____ Hudon responded, Michael Balloue had broken Mr. Burningham's jaw, torn his ear from his head in a 3" gash, caused severe hemorrhaging in his eye, and left multiple welts all over his head from the impact of his fists, and the resulting impact of Mr. Burningham's head on the floor.

33.     When Officer J. _____ Hudon finally did respond, he elected to spray Mr. Burningham in the face with oleoresin capsicum spray, causing additional injury to Mr. Burningham's eyes and open wounds, and leaving Mr. Burningham unable to protect himself from the ongoing attack. Officer J. _____ Hudon finally called for back-up as there were no other officers present to provide security or aid. Officer J. _____ Hudon later told Mr.

*COMPLAINT – PAGE 9*

Burningham that he was sorry for his actions, and that it was his first experience with a situation like that.

34.     Officer J. _____ Hudon failed to adequately secure the common area, failed to respond in a timely manner to Michael Ballou's attack on Mr. Burningham, and caused further injury to Mr. Burnginham by spraying him, the victim of the attack, in the face and eyes with oleoresin capsicum spray, thereby preventing Mr. Burningham from protecting himself from the continuing attack.

35.     Mr. Burningham sustained serious injuries and mayhem was committed upon his body as a direct result of Sargent _____ Green, Sargent _____ Martinez, and Counselor Sarah Fink, and other prison staff's failure to adequately evaluate and screen inmates prior to placement in certain housing units based upon their respective crimes and/or history, and as a result of Officer J. _____ Hudon and other prison staff's failure to monitor tier D-2 where Mr. Burningham was being housed, failure to monitor the specific common area where he was viciously attacked and beaten, failure to timely intervene, failure to take appropriate action to intervene, so that injury could be prevented, and actions that worsened the injury and prevented Mr. Burningham from protecting himself.

36.     Mr. Burningham was taken to St. Luke's Medical Center where he was diagnosed with, and treated for, a partially detached right ear, partial deafness, loss of equilibrium, a severely broken jaw, a hemorrhaged right eye, and other severe and debilitating injuries.

37.     Mr. Burningham suffered numerous other head injuries for which Mr. Burningham is believed to have suffered an altered mental state, which remains undiagnosed because he has been refused access to a neurosurgeon for further diagnosis or testing. Mr. Burningham's mother, Kathy Nichols, will testify that Mr. Burningham's Tourette's Disorder was substantially worsened, and

*COMPLAINT – PAGE*

that he suffers severe memory loss and an inability to recall basic facts.

38.     The above-identified injuries are not all the injuries that were suffered and inflicted upon by Mr. Burningham.

39.     Mr. Burningham was discharged from the hospital the following day and returned to the ICC medical unit with a wired and immobilized jaw, and put on a restricted liquid diet, a "Full Liquid through a straw" diet, as a result of the dental work required to correct his teeth and the wiring to repair his jaw which prevented him from opening his mouth.

40.     While in the ICC medical unit Mr. Burningham received substandard medical care and was not provided with sufficient caloric intake on the liquid diet he was prescribed, such that he suffered extreme weight loss as a result. Medical records show that prior to October 11, 2011, Mr. Burningham weighed approximately 220 pounds. After complaining that he was not getting enough to eat, Mr. Burningham weighed 181 pounds on October 16, 2011. At that point, Dr. David Agler, MD, ordered Mr. Burngham to be weighed daily, however there is no record of Mr. Burningham's weight being taken daily. Medical records show that on October 18, 2011, Mr. Burningham was weighed on two different scales, one showing his weight at 186 pounds, and the other at 198 pounds. Medical staff decided to use the higher-weighing scale from then on, and on November 5, Mr. Burningham weighed 193 pounds.

41.     Medical Records show that Mr. Burningham received a majority of his medical care from Doctor David Agler, MD, and Nurse Bryce Aitken, NP. Both Dr. Agler and Mr. Aitken failed to appropriately monitor Mr. Burningham's nutrition causing rapid weight loss and additional pain and suffering to Mr. Burningham.

42.     While at the ICC medical unit, Mr. Burningham attempted to grieve the actions and inactions that led to his attack. While in the ICC medical unit, he was only permitted contact with
*COMPLAINT – PAGE*

ICC medical staff. He filed a grievance on October 18, 2011 to Sargent _____ Martinez, then SMU supervisor responsible for creating the housing plan which placed Mr. Burningham on tier D-2. He filed a grievance to Sargent _____ Green on October 19, 2011, and a grievance to Counselor Sarah Fink on October 28, 2011. Due to medical staff's delay in passing on the grievances, on December 1, 2011, Ms. _____ Saade rejected the grievances for being beyond the 30-day time period. Mr. Burnginham then grieved to Deputy Warden Tom Kessler on December 8, 2011 that his grievances were timely filed, but not timely received for reasons beyond his control. Deputy Warden Kessler responded that Mr. Burningham should re-submit his grievances.

43.     Mr. Burningham did re-submit his grievances.   However, his grievance to Counselor Sarah Fink received no response. His grievance to Sargent _____ Green received a response that Sargent _____ Green was no longer employed, and his grievance to Sargent _____ Martinez received a response that Sargent Martinez believed Sargent Green and "DEF staff" had screened Mr. Burnham and that he was "proud" none of housing plans had resulted in violence.

44.     Mr. Burningham also received a response from an officer Shane Jepsen to a grievance filed December 14, 2011, which states that the "Use of Force was justified" and the application of oleoresin capsicum spray was "equitable" and denying Mr. Burningham ever protested being placed on tier D-2. Deputy Warden Kessler concurred with this response upon appeal.

45.     Mr. Burningham has exhausted his administrative remedies.

46.     Besides his ongoing physical trauma, Mr. Burningham continues to suffer mental and emotional pain, depression, anxiety and nightmares as a result of his attack and beating.

*COMPLAINT – PAGE*

47.     These emotional traumas were cruelly re-invoked and exacerbated on July 17, 2013, when correctional officers Lietenant _____ Clark and Sargent _____ Lou relocated Mr. Burningham to ICC. Mr. Burningham had been at the Maximum Security prison, and no complaints of Mr. Burningham's bad behavior were made, nor was any other possible explanation of his relocation given to him. When Mr. Burningham's relocation was called, his bags were already packed. Despite Mr. Burningham's adamant and vigorous protests, he was taken back to ICC. Fortunately, he was able to contact his mother, Kathy Nichols at 10:30 p.m. that night, who will testify that during that call he was hysterical and afraid for his life.

48.     Only as the result of a demand letter and multiple phone calls by Sallaz & Gatewood to ICC did ICC staff remove Mr. Burnginham from ICC. No explanation for Mr. Burningham's sudden transfer has been given. Mr. Burningham's transfer on July 17, 2013 further demonstrates the Defendants deliberate indifference, and their ongoing failure to adequately screen inmates. Additionally, it demonstrates the futility of Plaintiff's previous grievances which were blatantly disregarded.

49.     Mr. Burningham continues to suffer from a substantial hearing loss from his partially severed right ear, and reduced sight from his right eye as well as further complications from his fractured jaw, memory loss, an increase in the severity of his Tourette's syndrome, anxiety, and constant fear.

50.     The above-named defendants and the Idaho Department of Corrections and their officers, agents, assistants and employees, and Corrections Corporation of America individually and collectively were deliberately indifferent to a substantial risk of harm to health or safety of Mr. Burningham. Each of the defendants Sargent _____ Green, Sargent _____ Martinez, Counselor Sarah Fink, failed to properly screen Mr. Burningham's housing placement, and

*COMPLAINT – PAGE*

deliberately placed him on tier D-2 where they were told he would face violence from prison gangs. Officer J. _____ Hudon failed to prevent the attack, failed to timely respond to stop the attack and end further injury to Mr. Burningham, and deliberately sprayed Mr. Burningham in the face with oleoresin capsicum thereby limiting his ability to defend himself. Doctor David Agler, MD, and Nurse Bryce Aitken, NP. Both Dr. Agler failed to appropriately monitor and administer Mr. Burningham's nutrition causing rapid weight loss and additional pain and suffering to Mr. Burningham.

51.    The acts of defendants, and each of them, subjected plaintiff to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments of the United States Constitution and have caused plaintiff to suffer damages. Each of the defendants Sargent _____ Green, Sargent _____ Martinez, Counselor Sarah Fink, failed to properly screen Mr. Burningham's housing placement, and deliberately placed him on tier D-2 where they were told he would face violence from prison gangs. Officer J. _____ Hudon failed to prevent the attack, failed to timely respond to stop the attack and end further injury to Mr. Burningham, and deliberately sprayed Mr. Burningham in the face with oleoresin capsicum thereby limiting his ability to defend himself. Doctor David Agler, MD, and Nurse Bryce Aitken, NP. Both Dr. Agler failed to appropriately monitor and administer Mr. Burningham's nutrition causing rapid weight loss and additional pain and suffering to Mr. Burningham.

52.    CCA, its officials, management and employees violated the Plaintiff Burningham's constitutional rights and, without limiting other acts and behaviors: were deliberately indifferent in the care provided to Plaintiff Burningham by: (1) failing properly to screen and segregate inmates known to be vulnerable to attack (2) failing to properly screen and segregate inmates known to have acted violently in the past; (3) failing to provide sufficient staff at the unit where

*COMPLAINT – PAGE*

Mr. Burningham was housed; (4) failing to follow its established safety procedures; (5) failing to provide necessary and appropriate security measures; (6) failing to develop and implement a classification system and corresponding housing plan for inmates at the central detention facility; and, (7) failing to provide necessary and appropriate personnel necessary for the safety, welfare and protection of inmate Mr. Burningham, (8) failing to provide enough open beds for inmates to be housed safely.

53.     ICC was constructed on state-owned land in Kuna, Idaho, with public tax funds. ICC is operated under the jurisdiction of IDOC.

54.     IDOC entered into a contract with CCA under which CCA is paid to manage and operate ICC on a day-to-day basis.

55.     During 2008 and 2009, ICC housed approximately the same number of inmates as does the Idaho State Correction Institution, (hereinafter ISCI), nearly 1,500 men. Yet, during 2008 and 2009, three times as many prisoner-on-prisoner assaults occurred at ICC as at ISCO. Upon opening of new housing units, ICC now houses approximately 2000 prisoners.

56.     Violence at ICC far exceeds the violence in other Idaho facilities because of: (a) deliberate indifference of many ICC employees, including the named defendants; (b) inadequate training of staff; (c) inadequate number of staff; (d) inadequate supervision of staff; (e) the promotion of a culture throughout the facility that relies on the degradation, humiliation, and subjugation of prisoners, thereby creating excessive and unnecessary tension, stress, and frustration within the prisoner population; (f) failure to adequately investigate acts of violence, including a failure to track the number and location of assaults so as to take appropriate remedial action; (g) failure to discipline those guards whose misconduct or malfeasance contributed to an act of violence, including those guards who deliberately arranged assaults or who refused to

*COMPLAINT – PAGE*

remove a prisoner from a clearly dangerous environment; (h) placement of vulnerable prisoners with predatory prisoners; (i) failure to isolate or properly discipline prisoners who attack other prisoners; (j) maintaining a "code of silence" such that staff are discouraged from reporting errors, including their own errors, that caused or contributed to an act of prisoner violence; and (k) the deliberate reliance on--and encouragement of--prisoner violence as a management tool.

57.    The number of assaults actually occurring at ICC is considerably higher than reported, perhaps three times as high. For one thing, ICC deliberately fails to document many assaults. For another, many victims of prisoner assault choose to conceal the incident out of fear of reprisal by prisoners for being a "snitch." Indeed, in a newspaper article dated April 5, 2009, an IDOC official, discussing the level of violence at ICC, told a reporter for the Associated Press: "It is fair to estimate that for every one incident we know of, there may be two that we do not."

58.    ICC is understaffed. At times there are only two guards supervising more than 250 prisoners in the North Wing Units and only two for more than 350 prisoners in the West Wing Units. ACA standards recognize that where, as at ICC, training of staff is deficient, there is a high turnover rate, and violence is rampant in the prisoner population, then more staff is necessary. Thus, ICC is understaffed. Moreover, ICC remained understaffed despite previously agreeing in the September 20, 2011 Settlement Agreement (*supra*), as recognized in the September 16, 2013 finding of contempt.

59.    In this case, CCA failed to adequately staff tier D-2 where Mr. Burningham was housed and injured, as there was only one officer present for management of a common area where a vulnerable inmate was housed with gang members. Moreover, that officer, Officer J. _____ Hudon lacked sufficient experience to properly provide for the security of tier D-2. Therefore, CCA's failure to adequately staff tier D-2 caused in part or in whole, the opportunity
*COMPLAINT – PAGE*

for attack, the inability to respond sufficiently to the attack once it began, and the resulting injuries to Mr. Burningham.

60.     In addition, CCA fails to properly screen and segregate vulnerable inmates from inmates known to have acted violently in the past. In this case, Mr. Burningham, having been convicted of Injury to a Child under Idaho Code §1501(1), a crime that CCA knew or should have known would make him vulnerable to attack by certain other inmates, was vulnerable to attack by prison gangs such as the Severely Violent Criminals (SVC) and the Aryan Knights (AK). CCA knows these gangs exist, identifies them as "Security Threat Groups," and allows them to exist despite the violence they inflict on vulnerable inmates such as Mr. Burningham. Therefore, CCA's failure to screen and segregate vulnerable inmates from violent inmates caused in part or in whole his placement on tier D-2 where he was attacked.

61.     Furthermore, CCA, in order to maximize its profits at ICC, generally operates at or above its operating capacity. As noted in the 2010 Legislative Report, ICC's population in November 2009 was 100.2 percent (2,021 prisoners) of its operating capacity of 2,016 prisoners. This predicament, although profitable for ICC, is dangerous to prisoners. Having a small number of empty beds makes it difficult to quickly move prisoners away from a dangerous environment. As the Legislative Report notes: "When prisons operate at or near capacity, the ability to safely manage population growth or contingencies such as emergencies or serious incidents is reduced." (p. 8).

62.     In this case, had CCA operated at its appropriate capacity, Mr. Burningham could have been more appropriately housed. For example, he could have been placed at tier E-2, as requested, while waiting for an empty bed on A-tier, or placed on A-tier as he was supposed to have been from the beginning. Mr. Burningham's placement on D-2 and ultimately his injuries,

*COMPLAINT – PAGE*

are therefore in part or in whole the result of CCA's operating above capacity.

63.     CCA allows prison gangs to operate within ICC and reaps monetary benefits from doing so. This pattern of conduct, continually allowing prison gangs to operate, failing to provide adequate staff to ensure the security of inmates, failing to screen vulnerable inmates and violent inmates so they are separated, amounts to a policy by which CCA profits at the expense of the safety of vulnerable inmates, such as Plaintiff Rowe Burningham.

64.     During the investigation this case, Mr. Burningham had multiple problems receiving his mail. On March 12, 2012, Mr. Burningham received mail that was stamped received by ICC on March 8, 2012. This exceeds the 24-hour time limit for getting mail to inmates, in violation of IDOC policy 402.02.01.001.Multiple packages from his family were never received at all. Additionally, on January 6, 2012, Mr. Burningham received mail marked "legal mail" was that already opened. When he requested that all his legal mail be opened in his presence, he was told only that Probation and Parole had given it to ICC already opened.

65.     Mr. Burningham has exhausted his administrative remedies. The opening of legal mail outside the presence of the addressees constituted a violation of federal law and prison policy. Mr. Burningham intends to seek a protective order from the Court if these violations continue.

66.     The Supreme Court and the Ninth Circuit have made it clear that prison officials violate the Eighth Amendment rights of prisoners both when they *undertake an act* that places a prisoner at substantial risk of serious harm and when they *fail to act* to abate such a risk. "Thus, violations of the Eighth Amendment may occur as a result of either 'a prison official's act *or omission.' Farmer [v. Brennan]*, 511 U.S. [825], 834 [1994]." *Clem v. Lomeli*, 566 F.3d 1177, 1181 (9th Cir. 2009) (emphasis supplied in *Clem*).
*COMPLAINT – PAGE*

67.     Prison officials, and specifically Sargent _____ Green, Sargent _____ Martinez, and Counselor Sarah Fink, were placed on notice that the victim faced a substantial risk of serious harm, and yet these officials *failed to act* to abate that risk. CCA's policies actually *created* that substantial risk by deliberately moving Mr. Burningham into a housing unit, D-2, where the officers knew an assault was likely to occur.

68.     Unless and until IDOC Director Brent Reinke begins to exercise his responsibility to ensure that IDOC prisoners incarcerated at ICC are reasonably protected against assault by other prisoners, vulnerable inmates at ICC will continue to become victims of prison gang violence.

69.     Evidence of Defendants' deliberate indifference to prisoner health and safety is copious and overwhelming. First, CCA refuses to provide funds for, and Warden Wengler refuses to hire and train, a sufficient number of correctional officers. It is impossible for ICC to provide prisoners with adequate protection from assault--or to timely intervene when an assault has commenced--with as few guards as ICC has on its staff.

70.     29. Second, the training that ICC provides to persons seeking a position as a guard is inadequate and ineffective. Former employees will testify at trial that during final examinations, answers to questions are sometimes written on the board, suggested or even given by the examiners, and that applicants rarely flunk the exam no matter how incompetent they may be.

71.     30. Third, CCA fails to require, and Defendants Wengler and Rodriguez refuse to ensure, that prisoner assaults will be adequately investigated in order to determine what steps should be taken to prevent future assaults, and to determine whether misconduct or malfeasance by a guard caused or contributed to the assault.

*COMPLAINT – PAGE*

72. Fourth, CCA and Defendant Wengler fail to ensure that those guards whose malfeasance or misconduct caused or contributed to prisoner violence will be disciplined or retrained. Consequently, guards act with impunity even when they deliberately place prisoners in a housing unit where they are likely to be assaulted; when they refuse to remove prisoners from housing units when these prisoners report having been threatened with assault; and when they negligently (or perhaps deliberately) open the wrong doors, thereby allowing prisoners to assault one another.

73. Fifth, Warden Wengler has known for years that ICC prisoners face significant and unnecessary risk of injury from assault, and yet he refuses to take reasonable measures to abate that violence. During at least the past four years, Wengler has read numerous prisoner grievances complaining about assaults; has seen medical reports describing serious injuries that prisoners have suffered from assaults; has spoken with many prisoners who have been assaulted; has read media reports issued in 2008 and 2009 identifying ICC as a grossly violent facility; and has spoken with staff who have complained about the level of violence at ICC. Yet Wengler has permitted a reign of terror, violence, and intimidation to pervade ICC.

74. Sixth, ICC maintains its own in-house medical unit, and it is obvious that ICC-- under the direction and instruction of CCA and Warden Wengler--operates this unit in such a depraved manner that its intention is to conceal injuries, not treat them. For instance, CCA and Wengler have established a policy and practice of not taking x-rays of the severe injuries suffered by assault victims. This way, (a) ICC saves money (at the expense of prisoners who need urgent medical care) by not taking x-rays and not hiring medical staff to read the x-rays, and (b) ICC is able to conceal the extent of injuries suffered by the victims of assault.

75. Seventh, ICC--under the direction and instruction of Warden Wengler--has a policy
*COMPLAINT – PAGE*

and practice of refusing to refer for prosecution the perpetrators of prisoner assaults, except in very rare situations. This policy and practice is motivated by a desire to conceal the carnage that is occurring at ICC. This policy and practice encourages violent prisoners to assault other prisoners because they know they can do so with relative impunity

76.     Eighth, Warden Wengler perpetuates a "code of silence" at ICC. He discourages the reporting of official misconduct. Wengler has given staff no training or any encourage-ment to report misconduct committed by staff. To the contrary, those officers who report mistakes committed by officers are retaliated against by Wengler and by other staff.

77.     Ninth, Warden Wengler either promulgated or knows about and has acquiesced in the policy and practice of issuing Disciplinary Offense Reports to the victims of assaults. This practice helps conceal the fact that guards failed to protect the victim from the attack. Victims are frequently charged with "fighting" or "mutual combat" even when they were blind-sided by their assailant and offered no resistance to an assault.

78.     Tenth, ICC, in order to maximize its profits, generally operates at or above its operating capacity. As noted in the 2010 Legislative Report, ICC's population in November 2009 was 100.2 percent (2,021 prisoners) of its operating capacity of 2,016 prisoners. This predicament, although profitable for ICC, is dangerous to prisoners. Having a small number of empty beds makes it difficult to quickly move prisoners away from a dangerous environment. As the Legislative Report notes: "When prisons operate at or near capacity, the ability to safely manage population growth or contingencies such as emergencies or serious incidents is reduced." (p. 8).

79.     In short, Wengler has enacted policies and practices that foster violence, fail to reduce violence, and follows a turn-a-blind-eye approach to assaults. As a result of Wengler's
*COMPLAINT – PAGE*

failure to properly control and supervise his subordinates, to hire and train enough staff, and to take reasonable steps to prevent violence, Wengler has condoned, acquiesced in, and promoted the carnage occurring at ICC.

80. The failures described above continue to this day, placing all prisoners of ICC at unnecessary and substantial risk of being assaulted by other prisoners.

## FIRST CLAIM FOR RELIEF

81. Based on the facts set forth above, named Plaintiff Rowe Burningham asserts that Defendants CCA, Wengler, Green, Martinez, Fink, Alger, and Aitkins enacted and/or pursued or acquiesced in the policies and practices set forth above, and engaged in the acts described above, which resulted in violation of rights secured to him by the Eighth and Fourteenth Amendments to the U.S. Constitution. Mr. Burningham seeks compensatory and punitive damages against those defendants jointly and severally pursuant to 42 U.S.C. §1983.

## SECOND CLAIM FOR RELIEF

82. Based on the facts set forth above, named plaintiff Rowe Burningham asserts that CCA, Warden Wengler, and their employees at ICC have been and are pursuing the policies and practices described above, the result of which is to deprive him of the rights guaranteed by the Eighth and Fourteenth Amendment to the U.S. Constitution.

83. As a result of these policies and practices, Plaintiff was denied reasonable protection from assault. These policies and practices include the failure to hire an adequate number of staff; to adequately train staff; to adequately investigate each prisoner assault to

*COMPLAINT – PAGE*

determine whether it could have been prevented by staff and whether staff misconduct or malfeasance caused or contributed to the assault; to issue adequate written findings, conclusions, and recommendations after each assault; to eliminate the code of silence that pervades ICC; to ensure that noncompliant or untrained staff receive the discipline they deserve or additional training they need to prevent unnecessary violence at ICC; to adequately punish the violent offenders who assault prisoners; and to provide adequate medical care to the victims of assault.

84.     The named plaintiffs and the plaintiff class also assert that Defendant Brent Reinke is failing and refusing to properly exercise his duties as Director of the IDOC to ensure that ICC provides reasonable protection from assault to all IDOC prisoners incarcerated at ICC.

85.     Relief is sought pursuant to 42 U.S.C. §1983.

## PRAYER FOR RELIEF

Wherefore Plaintiff respectfully prays that this Honorable Court will:

1.     Accept Jurisdiction over this cause.

2.     Grant Plaintiff Rowe Burningham pursuant to 42 U.S.C. §1983 compensatory damages against Defendants Wengler, Green, Martinez, Fink, Alger, Aitkins and Corrections Corporation of America, Inc., jointly and severally, in an amount as the proof will show at trial.

3.     Grant Plaintiff pursuant to Defendants Wengler, Green, Martinez, Fink, Alger, Aitkins and Corrections Corporation of America, Inc., jointly and severally, in the amount $156,761,000 which is approximately the net income of CCA for the year 2011, to punish these defendants and to discourage them and other similarly situated persons and entities from engaging in this type of reprehensible conduct in the future.

*COMPLAINT – PAGE*

4.      Issue injunctive relief on behalf of Plaintiff Rowe Burningham pursuant to Rule 65 of the Federal Rules of Civil Procedure, order Defendants Reinke and Corrections Corporation of America to take all reasonable steps to ensure that Plaintiff will be protected against unnecessary and preventable assault by other prisoners, and not returned to ICC for the remainder of his sentence. Defendants should be ordered, among other things, to take all reasonable steps to ensure that Plaintiff will be protected against unnecessary and preventable assault by other prisoners. Defendants should be ordered, among other things, (a) to hire an adequate number of staff; (b) to adequately train staff; (c) to adequately investigate each prisoner assault to determine whether it could have been prevented by staff and whether staff misconduct or malfeasance caused or contributed to the assault; (d) to issue adequate written findings, conclusions, and recommendations following each assault as to whether the assault could have been prevented; (e) to ensure that noncompliant or untrained staff will receive the discipline they deserve or additional training they need to prevent unnecessary violence at ICC; (f) to ensure that incident reports, documents, and logs are properly made and retained regarding incidents of prisoner assault; (g) to take all reasonable steps to eliminate the code of silence that pervades ICC; (h) to ensure that the victims of assault receive proper medical care for their injuries; (i) to expunge all references in prison files to DORs (regardless of their outcome) issued against prisoners, including the named plaintiffs, who were the victims of assault; (j) to report all assaults resulting in significant injury to local law enforcement officials, including those assaults that appear to be hate crimes; and (k) to ensure that all proposed housing moves of prisoners will be reviewed by the ICC Gang Coordinator prior to implementation. In addition, Defendant Reinke should be ordered to make certain that ICC promptly implements corrective measures to ensure that IDOC prisoners are reasonably protected against assault and will receive adequate medical care for injuries sustained

*COMPLAINT – PAGE*

from an assault, and to ensure that all IDOC prisoners will be removed from ICC if those results are not achieved within a reasonable period of time.

5.     Grant such additional and further relief, including the award of attorney's fees and costs, as the Court may deem proper under the circumstances.

DEMAND FOR JURY TRIAL

6.  The plaintiff hereby demands a jury trial.

Dated this // day of October, 2013.

Lauren E. McConnell
Denny Sallaz

Attorneys for the Plaintiff, Rowe Burningham

*COMPLAINT – PAGE*